**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CAUSE NO. 2:10-CR-55 |
| ) | |
| CHRISTOPHER L. SPEARS, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

This matter is before the Court on the Motion for a New Trial as to Counts One and Two, filed by Defendant, Christopher L. Spears, on December 20, 2010 (DE #132). For the reasons set forth below, the Motion for a New Trial (DE #132) is **DENIED**.

BACKGROUND

The Defendant, Christopher L. Spears ("Spears"), was charged in a five count Superseding Indictment as follows: (1) Count 1 - aiding and abetting fraud during an attempted firearms purchase, in violation of 18 U.S.C. §§ 2 and 922(a)(6); (2) Count 2 - aggravated identity theft, in violation of 18 U.S.C. § 1028A; (3) Count 3 - producing false identification documents, in violation of 18 U.S.C. § 1028(a)(1); (4) Count 4 - possessing five or more false

identification documents with unlawful intent, in violation of 18 U.S.C. § 1028(a)(3); and (5) Count 5 - possessing an implement designed to make a forged security, in violation of 18 U.S.C. § 513(b). A jury trial was held in September of 2010. On September 24, 2010, a jury verdict was returned against Spears, finding him guilty of all counts. Spears filed a timely Motion for a New Trial on December 20, 2010.[1] (DE #132.) The motion was taken under advisement, the Government was ordered to file a response by January 18, 2011, and Spears was ordered to file a reply by January 25, 2011. (DE #133.) The Government filed its response on January 17, 2011 (DE #134), and Spears filed his reply on January 25, 2010 (DE #135). On January 26, 2011, the Government filed a Motion to Strike the New Arguments in the Defendant's 'Reply' in Support of his Motion for a New Trial. (DE #136.) The motion to strike was denied by this Court, and the Government was ordered to file a sur-reply. (DE #137.) The Government filed its Sur-Reply on February 15, 2010.[2] (DE #139.) The motion is now ripe for adjudication.

In his Motion for a New Trial, Spears argues that "[t]he government failed to prove that Mr. Spears aided and abetted Tirsah Payne" because Spears could only be found guilty "if it were proven

---

[1] Spears filed, and the Court granted, several timely motions for extensions because the trial transcript was not yet available.

[2] On February 14, 2011, the Government filed a Motion for One Additional Day to File its Sur-Reply to the Defendant's Motion for a New Trial. (DE #138.) The Motion is hereby **GRANTED**.

beyond a reasonable doubt that he knowingly associated with the criminal activity of Tirsah Payne, participated in the activity, and tried to make it succeed." (DE #132, p. 1-2.) Spears states that Tirsah Payne's testimony on cross examination showed that "she did not communicate to either 'Tony' or Mr. Spears any intent to use the permit to attempt to buy a gun." (*Id.* at 2.) After citing specific testimony in support of his position, Spears concludes his motion by stating that:

> Ms. Payne is herself testifying that Mr. Spears did not aid and abet her in purchasing the firearm on September 26, 2009. Her testimony reveals that Mr. Spears did not ever know that she would go out and try to buy a gun using the gun permit. And there is absolutely no evidence that Mr. Spears had even the slightest knowledge that Ms. Payne would attempt to use the permit to attempt to buy a gun, he did not aid and abet Tirsah Payne in the criminal activity described in Count One and did not transfer the fake gun permit during and in relation to the offense charged in Count One.

(*Id.* at 3-4.)

The Government responds by asserting that Spears is mistaken in his analysis of aiding and abetting liability and that Tirsah Payne's testimony establishes that she communicated to Spears and Tony that she bought the gun permit with the "dual purposes of wanting to be able to carry a gun with impunity, and wanting to be able to buy a gun despite her legal troubles." (DE #134, p. 2.) The Government contends that the testimony establishes that "Tony and the Defendant were pitching their fake gun permits as documents

that *could be used to defraud a gun dealer* during the purchase of a firearm - exactly what Ms. Payne eventually tried to do with the fake permit." (*Id*. at 3) (emphasis in original). Furthermore, the Government asserts that the evidence shows Spears and Tony "convinced Ms. Payne to buy the permit by expressly pointing to one of the illegal uses to which she could put the permit" and that he aided and abetted her crime when he "sold her a fake gun permit using a sales pitch that *specifically* encouraged her to use the permit that way." (*Id*. at 4) (emphasis in original).

In his reply, Spears generally argues that the Government did not meet its burden of "proving that he shared Ms. Payne's criminal intent to furnish the fake firearms carry permit to a federally licensed firearms dealer, which fake permit was intended or likely to deceive the firearms dealer as to Ms. Payne's status as a felon" because she did not communicate such specific intent to him. (DE #135, p. 2.) Spears cites to *U.S. v. Greer*, 467 F.2d 1064 (7th Cir. 1972) to support his position that the Seventh Circuit "requires proof of a 'specific intent' to aid in '**the crime charged**' or a 'specific knowledge' of '**the crime charged**.'" (DE #135, p. 4) (emphasis in original). Spears raises and discusses the following points: (1) that he "did not know that Tirsah Payne intended to use the fake carry permit to buy a gun" because "at the time that Ms. Payne purchased the fake carry permit" she did not

have "a specific plan to use it to buy a gun"[3] and did not "communicate[] that intent to him" (DE #135, pp. 5-7); (2) that he did not "aid and abet Tirsah Payne in deceiving the firearms dealer as to her felony status" because he had no knowledge that she was a felon[4] (*Id.* at 7-9); and (3) that he did not "aid and abet Tirsah Payne in furnishing a fake carry permit to a federally licensed firearms dealer" because he had "no knowledge that [she] intended to furnish her fake carry permit to a federally licensed firearms dealer as opposed to a non-federally licensed firearms dealer or other party" (*Id.* at 9-10).

After the Court denied the Government's request to strike arguments in Spears' reply, the Government filed its sur-reply, arguing that the holding in *Greer*, requiring proof of a specific intent to aid in the crime charged, is narrow and inapplicable to the instant case. (DE #139, p. 1.) The Government asserts that *Greer* simply "defines the outer limits" of the Government's burden of proof when "'there is an extended course of criminal conduct' and a defendant who participates in 'one stage' is charged with aiding and abetting 'a subsequent one.'" (*Id.* at 3) (*citing U.S. v. Greer*, 467 F.2d 1064, 1069 (7th Cir. 1972). In this case, the

---

[3] Spears points out that the Government agrees that, at the time of purchase, Tirsah Payne did not have a "specific plan to use it on September 26th. . . to straw-purchase a gun for someone else." (DE #134, p. 2.)

[4] Spears points out that when Tirsah Payne bought the fake permit in July of 2009 she was not a felon, that she did not become a felon until late August 2009, and that she did not attempt to purchase the gun as charged until September 26, 2009. (DE #135, p. 8.)

Government argues, Spears was charged with aiding and abetting a "single, discrete criminal event: Ms. Payne's attempt to use the fake gun permit to buy a gun" and that there was sufficient evidence to convict Spears on the charge of aiding and abetting under the Seventh Circuit's mainstream principles. (DE #139, pp. 3-4, 7.)

<u>Superseding Indictment and Relevant Trial Testimony</u>

Count 1 of the Superseding Indictment provides that:

> From in (sic) or about July 2009 until on or about September 26, 2009, in the Northern District of Indiana, **CHRISTOPHER L. SPEARS**, defendant herein, in connection with the attempted acquisition of a firearm from Blythe's Sport Shop, Inc. by another person known to the grand jury [as Tirsah Payne], did knowingly aid and abet the furnishing and exhibitioning of a false and fictitious identification, namely, a fraudulent Indiana License to Carry a Handgun Permit, bearing number 9688117 and the actual name of [Tirsah Payne], to Blythe's Sport Shop, Inc., a federally licensed firearms dealer, which fraudulent identification was intended or likely to deceive Blythe's Sport Shop, Inc. as to a fact material to the lawfulness of the sale of a firearm, in that the Defendant created the fraudulent identification for use by [Tirsah Payne] and put [Tirsah Payne's] actual name on the fraudulent identification.

(DE #93, pp. 1-2.) To sustain the charge described in Count 1, the Government needed to prove: (1) that Tirsah Payne knowingly furnished and exhibited a false and fictitious identification to a federally licensed firearms dealer; (2) that such furnishing and exhibition was made in connection with the attempted acquisition of

a firearm; (3) that such furnishing and exhibition was intended to or likely to deceive the firearms dealer as to a fact material to the lawfulness of the sale of such firearm; and (4) that the Spears knowingly aided and abetted Tirsah Payne in this activity. (See DE #118, p. 28.)

The trial testimony at issue in the Motion for a New Trial focuses on the direct, cross, and redirect examinations of Tirsah Payne as it relates to the charge described in Count 1. (See Tr. Vol. 1, pp. 98-164.) For purposes of this Order and to provide a broad, overall understanding of Tirsah Payne's testimony, the Court feels that it is important to quote extensively from the testimony itself rather than to provide only selected snippets. During the direct examination, Tirsah Payne described how in July of 2009 she was on probation for possession of cocaine and could not purchase a legitimate gun permit. (*Id.* at p. 104, lines 1-6.) She stated that she wanted a handgun permit so she could "go into the store and purchase another gun." (*Id.* at line 10.) Tirsah Payne described how she met two men named "Tony" and "Chris" at a gas station, and while she did not know "Tony's" last name, she was able to identify "Chris" as Spears. (*Id.* at pp. 104-05.) She proceeded to describe how Tony first approached her to talk about purchasing a fake gun permit; she indicated that the majority of the conversation occurred while she was standing on the outside of the car near the driver's window, Tony was sitting in the driver's

seat, and Spears was sitting in the passenger's seat of the car.

(*Id*. at pp. 105-08.)  Tirsah Payne indicated that, during this conversation, Spears was "participating" in that "[h]e was there. And as we talking, you know, he's there.  He's hearing everything that me and Tony was talking about." (*Id*. at p. 108, lines 4-10.) The Government asked Tirsah Payne for details regarding the conversation:

> Q.  How loudly was Tony speaking?
> A.  Loud enough so we can hear, so I can hear.
> Q.  Who did Tony say would make you a fake handgun permit?
> A.  Chris.
> Q.  What words did he use?
> A.  My boy got the hookup, he can make the gun permit for you.
> Q.  And did Tony indicate who his boy was?
> A.  Chris.
> Q.  How did he do that?
> A.  My boy, Chris.
> Q.  You're gesturing?
> A.  Yeah.
> Q.  Tony gestured to the defendant?
> A.  My boy, Chris.

(*Id*. at p. 108, lines 22-25 and p. 109, lines 1-11.)  Tirsah Payne then stated that both Tony and Spears showed her a copies of fake gun permits.  (*Id*. at p. 110, lines 1, 22.)

The Government questioned Tirsah Payne regarding her end of the conversation:

> Q.  Okay.  What, if anything, did you tell Tony and the defendant about whether you could legally purchase a gun?
> A.  That I was on probation, that I couldn't, you know – that I wanted a gun permit, that I couldn't purchase a handgun.

-8-

```
Q.   Did you ask Tony how you could use, in
     what ways you could use the fake gun
     permit?
A.   Yes.
Q.   What did he tell you?
A.   That you could go in a store and you can
     purchase a handgun and come out with it
     the same day.
Q.   Why did he tell you you could go in and
     come out the same day with a gun?
A.   Because he did it.
Q.   Because what about the permit?
A.   The permit, you know, you could go in
     there with the permit and your ID and you
     could come out with the gun the same day.
Q.   Did that seem possible to you?
A.   Yes, it did.
Q.   Why is that?
A.   Because I did it in 2000.
```

(*Id.* at p. 112, lines 3-24.) Tirsah Payne stated that, while

Spears listened to the entire conversation, she only spoke with him

directly to say hello, ask him his name, where he lived, and how he

was doing. (*Id.* at p. 113, line 15.) The Government then

questioned Tirsah Payne regarding the specifics of the transaction,

and she indicated that Tony and Spears wanted to charge her $200

for the fake permit but that she only ended up giving them $100.

(*Id.* at p. 113, lines 22-23 and p. 114, line 1.)

On cross-examination, Spears' attorney, John Martin ("Attorney

Martin"), questioned Tirsah Payne regarding her past gun ownership,

experience with purchasing guns, and her prior gun permits. (*Id.*

at pp. 128-137.) Attorney Martin elicited from Tirsah Payne that

she "wanted a permit so that [she] could carry a weapon." (*Id.* at

p. 137, lines 12-21.) Regarding the attempted gun purchase as

described in Count 1 of the Superseding Indictment, the following

exchange took place:

> Q.  This going to Blythe's, that happened on
>     September 26th of 2009, right?
> A.  Yes.
> Q.  Now, you purchased from Tony this permit
>     back in July of 2009, correct?
> A.  Yes.
> Q.  You didn't try and purchase any weapons
>     between July of 2009 and September 26th
>     of 2009, did you?
> A.  No, I didn't.
> Q.  All right. So the first time you went to
>     a store was in -- a store since you had
>     been placed on probation for -- and
>     gotten your felony conviction was
>     September 26th of 2009 to purchase a
>     weapon, right?
> A.  Yes, sir.

(*Id*. at p. 140, lines 16-25 and p. 141, lines 1-4.)  Attorney

Martin then questioned Tirsah Payne as to whether anyone had asked

her to purchase weapons for them prior to the attempted straw

purchase on September 26, 2009, and she stated that no one had made

such a request.  (*Id*. at p. 146.)  Attorney Martin continued:

> Q.  So when you purchased this fraudulent
>     permit to carry, you were not intending
>     to purchase weapons for these four minors
>     in July of 2009, were you?
> A.  No, I wasn't.
> Q.  That didn't come up until September 26th
>     of 2009, right?
> A.  Yes, sir.
> Q.  Now, during your interview with Agent
>     Hewitt in February of 2010, you indicated
>     that you never told Tony or Chris why you
>     needed a gun permit, correct?
> A.  Yes, sir.
> Q.  And you never indicated to Christopher
>     Spears or to this Tony person that you
>     had a felony conviction, did you?

```
A.   Did I let --
Q.   You didn't tell them you had a felony
     conviction, did you?
A.   Yes. They -- yes.
Q.   Do you recall when you were interviewed
     by Agent Hewitt on February 25th of 2010?
A.   Do I recall it? Yes.
Q.   And do you recall advising her that you
     never indicated to Chris or Tony that you
     had a felony conviction?
A.   No, I didn't say conviction. I told them
     I was on probation.
Q.   But you didn't tell them it was probation
     for a felony, did you?
A.   No, I didn't.
Q.   And you never told Chris or this person
     Tony why you needed the gun permit, did
     you?
A.   No, I didn't.
Q.   All right. You didn't discuss the details
     as to what you were on probation for, did
     you?
A.   No, I didn't.
```

(*Id.* at p. 146, lines 21-25 and p. 147, lines 1-25 and p. 148,

lines 1-2.)  Tirsah Payne admitted to Attorney Martin that, after

she got the fake permit from Tony and Spears, she started carrying

a gun again.  (*Id.* at p. 149, lines 16-20.)  She stated that she

was "hoping that [the police] wouldn't stop me or I wouldn't get

caught with the gun permit or the gun." (*Id.* at p. 150, lines, 22-

23.)  Attorney Martin pursued the issue of gun purchasing versus

carrying:

```
Q.   And after you purchased this fake gun
     permit in July of 2009, you started to
     carry your gun again, right?
A.   Yes, I did.
Q.   And isn't it true that the reason why you
     started carrying the gun again was
     because you thought because you had the
     fake gun permit that you could show it to
```

the police if they stopped you and that
                    you would then be able to carry the gun
                    because they would think you had a
                    permit, right?
          A.        Yes.
          Q.        And that was the purpose that you had
                    when you purchased the fake gun permit.
                    You wanted to be able to carry a weapon
                    for protection, right?
          A.        Yes.

(*Id*. at p. 154, lines 13-25.)    Attorney Martin continued

questioning Tirsah Payne regarding her intentions:

          Q.        And you never indicated to Christopher Spears
                    when you completed this transaction with Tony
                    that you wanted to go to a gun shop and
                    purchase a gun, did you?
          A.        No.
          Q.        And you wouldn't have even said that to
                    him at the time because at that time you
                    did not intend to go purchase a firearm.
                    You already had one, right?
          A.        Correct.

(*Id*. at p. 155, lines 23-25 and p. 156, lines 1-5.)    Tirsah Payne

went on to admit that she "like[s] guns," that she "want[ed] to be

able to carry a gun," and that she "want[ed] to be able to purchase

guns." (*Id*. at p. 158, lines 5-11.)

     On redirect, the Government questioned Tirsah Payne about

whether she had a dual purpose for wanting the fake gun permit.

She initially indicated to the Government that she wanted the

permit to be able to carry a gun:

          Q.        In the summer of 2009, why did you want
                    to have another Indiana handgun carry
                    permit?
          A.        To protect my -- to protect me and my
                    family.
          Q.        What did you want to do with that? Did

```
          you want to have it -- what did you want
          to do with the permit?
     A.   To be able to carry a gun.
```

(*Id*. at p. 161, lines 3-8.)   However, only moments later, she

indicated that she also wanted the permit to facilitate her in

purchasing a gun:

```
     A.   I wanted to protect my family, you know, so I
          can go and buy a gun.
     Q.   What did you tell Tony and the defendant
          at the time that you were talking to them
          about buying a handgun permit from them
          about whether you could legally purchase
          a gun?
     A.   Yes.
     Q.   What did you tell them?
     A.   That I wanted to buy a gun, you know --
          no, I wanted to -- I wanted a handgun.  I
          wanted a permit to carry a handgun.
     Q.   What did you tell them about whether you
          were able, legally able to purchase a
          handgun?
     A.   That I couldn't.
     Q.   What did you tell them? Why couldn't you?
          What was the reason you gave them for why
          you couldn't purchase a handgun legally?
     A.   I told him because I was on probation.
     Q.   What, if anything, did Tony tell you that
          you could do with the fake handgun
          permit?
     A.   That you could purchase a gun and go to
          the gun store and bring it home the same
          day.
     Q.   Do you remember a few minutes ago Mr.
          Martin asked you if the reason you wanted
          to buy a fake gun permit was so that you
          could start carrying a handgun?
     A.   So I could start carrying a gun?
     Q.   Yes.
     A.   Yes.
     Q.   Do you remember him asking you that?
     A.   Yes.
     Q.   And you said that was the reason?
     A.   Yeah.  Because I wanted to carry a
          handgun, and I wanted to buy one.
```

> Q. But there was another reason why you wanted to buy that fake gun permit?
>
> A. So I can buy one and carry it.

(*Id.* at 161, lines 19-25 and p. 162, lines 1-25 and p. 163, lines 1-3.)  Shortly thereafter, Tirsah Payne was excused.


DISCUSSION

Rule 33

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed.R.Crim.P. 33(a).  "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994).  A district court may "weigh evidence, evaluate credibility, and grant the motion if the substantial rights of the defendant have been jeopardized." *United States v. Eberhart*, 388 F.3d 1043, 1052 (7th Cir. 2004) (citation omitted), *vacated on other grounds*, 546 U.S. 12 (2005).  Regarding testimony, "[t]he focus in a motion for a new trial is not on whether the testimony is so incredible that it should have been excluded.  Rather, the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses." *U.S. v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999).  A district court is not required to view the evidence in a light most favorable to the Government but

must independently consider the evidence presented.  *Eberhart*, 388
F.3d at 1052.

The main thrust of Spears' argument is that he simply did not
have the intent required to be convicted of aiding and abetting
Tirsah Payne as charged in Count 1.  He argues that, according to
*U.S. v. Greer*, 467 F.2d 1064, 1069 (7th Cir. 1972), a broad reading
of aider and abettor liability is discouraged and the Seventh
Circuit requires proof of a specific intent to aid in the crime
charged or a specific knowledge of the crime charged.  Spears
asserts that, in this case, the "crime charged" was that Tirsah
Payne, "on a specific date, presented a fake gun permit to a
federally licenced firearms dealer, which fake gun permit was
intended or likely to deceive the firearms dealer as to her status
as a felon," and that Spears did not have the required specific
intent to aid Tirsah Payne in the commission of that crime as
charged in Count 1.

In *Greer*, the defendant was charged with participating in a
conspiracy to steal a shipment of copper, transport that copper in
interstate commerce, and conceal the stolen copper.  *U.S. v. Greer*,
467 F.2d 1064, 1066 (7th Cir. 1972).  He was also charged with the
substantive violation of transporting the stolen copper from
Greenfield, Indiana to Chicago, Illinois.  *Id*. at 1066-67.  From
his home in Carmel, Indiana, the defendant called up his
coconspirators in Chicago and advised them that there was a

disabled semi-truck with a load of copper in Greenfield, Indiana. *Id*. at 1067. Based on the defendant's tip, the coconspirators stole the load of copper and drove it from Greenfield to Chicago. *Id*. The coconspirators then unloaded and disposed of the copper. *Id*. At trial, evidence was presented that, after the theft, the defendant conversed with one of his coconspirators regarding the location of the proceeds from the sale of the stolen copper and to arrange a meeting to divide such proceeds. *Id*. However, the defendant presented evidence during the trial that he was in Florida when the actual crime occurred and that a meeting to distribute the proceeds never took place. *Id*. at 1067-68.

On appeal, the defendant argued that the evidence showed only that he aided and abetted the substantive theft of the copper, but not that he aided and abetted the transportation of that copper. *Id*. at 1068. This was so, the defendant asserted, because there was no proof that he knew of his coconspirators' plans to transport the copper across state lines. *Id*. The Government, on the other hand, argued that an "'aider and abettor' is responsible not only for the immediate acts he facilitates, but also for the other likely consequences of his acts." *Id*. Thus, the Government continued, "[s]ince the transportation of the stolen goods was a foreseeable consequence of their theft, the Government need not show specific intent to aid in this act." *Id*.

The Seventh Circuit concluded that, based on the facts of the

case and the three separate statutory crimes at issue[5], the Government's standard was too broad because it would "effectively obliterate[] the[] distinctions" between the statutes. *Id*. The court acknowledged that the analysis of aiding and abetting is "complicated . . . where there is an extended course of criminal conduct and where, though the defendant's participation is limited to one stage, he is charged with aiding and abetting a subsequent one." *Id*. at 1069. The court continued by stating that:

> [t]o allow a jury to infer an intent to aid in the commission of one offense from the demonstrated intent to aid in another earlier offense because the later crime is a foreseeable consequence of the earlier one, is to base criminal liability only on a showing of negligence rather than criminal intent. Model Penal Code § 2.04, Comment (Tent. Draft No. 1, 1953). The court will relax the intent component of aiding and abetting in a limited number of situations. We agree, for instance, that a defendant can be held responsible as an aider and abettor of a crime even where there is no direct proof that he intended to aid in the crime, if he is substantially involved in the chain of events leading immediately to it.

*Id*. The court in *Greer* recognized that some showing of specific intent is required "where the relationship between the defendant's acts and the ultimate crime for which he is charged is as attenuated as it is in the instant case." *Id*.

This Court finds that *Greer* is distinguishable from the

---

[5] The court acknowledged that "[c]ongress specifically provided for three separate crimes: theft of goods which were in interstate commerce (18 U.S.C. § 659), the transportation of stolen goods in interstate commerce (18 U.S.C. § 2314), and the knowing sale of such goods (18 U.S.C. § 2315)." U.S. v. Greer, 467 F.2d 1064, 1068 (7th Cir. 1972).

present case.  Here, the Court agrees with the Government that Spears was convicted of aiding and abetting a "single, discreet, criminal event: Ms. Payne's attempt to use the fake permit to buy a gun."  Because he created the fake gun permit for Tirsah Payne and sold it to her, he was substantially involved in the chain of events leading directly to her use of that permit as described in Count 1.  There was not a series of intervening, unrelated criminal acts between Spears' act of creation and Tirsah Payne's subsequent attempt to use that permit to purchase a gun; the relationship between the events was not attenuated.  Additionally, there were not multiple statues with separate requirements at issue in this case; Spears was charged with aiding and abetting fraud during an attempted firearms purchase, and that is what he was convicted of. Therefore, a showing of specific intent is not required in this case, and the general aiding and abetting standard will apply.

For general aiding and abetting liability, the Seventh Circuit has adopted Judge Learned Hand's test that "the aider and abettor 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'" *U.S. v. Fountain*, 768 F.2d 790, 798 (7th Cir. 1985) (citation omitted).  In such a case, a defendant needs to share in the principal's purpose.  *Id*. In other words, to be found guilty of aiding and abetting, the defendant must: (1) have knowledge of the substantive crime; (2) "a

desire to assist in the success of the activity;" and (3) perform at least one act of assistance. *U.S. v. Samuels*, 521 F.3d 804, 811 (7th Cir. 2008). The participation element can be proved using circumstantial evidence, and such evidence "may be of relatively slight moment." *Id*. Furthermore, a defendant does not need to aid and abet the principal in all of the elements of the underlying offense. See *U.S. v. Wesson*, 889 F.2d 134, 135 (7th Cir. 1989) ("Aiding and abetting is nothing if not a crime you may commit without performing all of the elements of the substantive offense.") In fact, "an aider presumptively intends the natural consequences of his actions." *U.S. v. Andrews*, 442 F.3d 996, 1002 (7th Cir. 2006).

In this case, the Court gave the standard Seventh Circuit pattern jury instruction regarding aiding and abetting which states that "[a]ny person who knowingly aids, counsels, commands, induces, or procures the commission of an offense may be found guilty of that offense. That person must knowingly associate with the criminal activity, participate in the activity, and try to make it succeed." (DE #118, p. 31.) The Court also instructed the jury that:

> [t]o establish that the Defendant aided and
> abetted Tirsah Payne, the Government must
> prove beyond a reasonable doubt that the
> Defendant knowingly associated with the
> criminal activity of Tirsah Payne,
> participated in the activity, and tried to
> make it succeed. Association means that the
> Defendant shared in the criminal intent of

Tirsah Payne.

(DE #118, p. 32.) Finally, the Court instructed the jury that "if the Defendant performed acts that advanced a criminal activity but had no knowledge that a crime was being committed or was about to be committed, those acts alone are not sufficient to establish the Defendant's guilt." (DE #118, p. 33.) These jury instructions clearly fit within the parameters of aiding and abetting law in the Seventh Circuit.

The Court has considered the evidence presented at trial in light of the law described above. Tirsah Payne herself testified that Spears was a significant part of the transaction that occurred in July of 2009. She provided details indicating that Spears was sitting in the passenger's side of the car while Tony and Tirsah Payne discussed the details of such transaction. He was involved in the conversation in that he actively listened to Tony's sales pitch which included a reference to Spears as his "boy, Chris" who had the "hookup" and could make the permit for Tirsah Payne. Spears showed Tirsah Payne a fake gun permit, he ultimately made her a copy of one using her name, and he received money for doing so. Importantly, while attempting to sell a fake gun permit to Tirsah Payne, Tony indicated that the permit could be used to "purchase a handgun [at a gun shop] and come out with it the same day." He bolstered this assertion by stating that he himself had done just that.

The Court agrees with the Government that the fact that Spears and Tony specifically encouraged Tirsah Payne to use the fake permit to attempt to purchase a firearm at a gun shop is indicative of the knowledge required for aiding and abetting the crime charged in Count 1. This knowledge becomes even more apparent when viewed in light of the fact that this "encouragement" occurred directly after Tirsah Payne told Spears and Tony that she couldn't legally purchase a gun because she was "on probation, that I couldn't, you know - that I wanted a gun permit, that I couldn't purchase a handgun." See e.g. *U.S. v. Woods*, 148 F.3d 843, 848 ("*Encouraging others* to use a gun in the commission of the underlying crime is also sufficient to establish aiding and abetting.") (emphasis added). Spears also had the required desire or intent to assist in the success of the activity because he provided Tirsah Payne with a high quality fake gun permit rather than an inferior product. The evidence at trial established that Spears had produced other fake gun permits, at least one of which was legitimate looking enough to initially pass inspection by law enforcement officers. Spears created the exact same type of fake permit for Tirsah Payne, and that particular permit did initially fool the gun shop clerk at Blythe's. Finally, it is clear that the evidence at trial established that Spears performed at least one act of assistance to aid and abet Tirsah Payne as described in Count 1. He created the fake permit for her and received money in return for doing so.

Although Spears argues that Tirsah Payne never told him of her specific intent to attempt to purchase a gun at Blythe's gun shop on September 26, 2009, she did not need to do so in order for Spears to be liable of aiding and abetting her. It is enough that, on the day she purchased the fake gun permit, she made it clear to Tony and Spears that she was "on probation, that I couldn't, you know - that I wanted a gun permit, that I couldn't purchase a handgun." Directly after making that statement, she asked Tony how she could use the fake permit, and he told her that she "could go in a gun store and you can purchase a handgun and come out with it the same day."[6] Although Spears is correct in noting that Tirsah Payne also testified that, in her own mind, wanted the gun permit to be able to carry a gun, a thorough reading of the testimony as a whole shows that Spears and Tony sold her a fake document and encouraged her to use that document to go into a gun store and attempt to purchase a gun. To the extent that there are inconsistencies in Tirsah Payne's testimony, after taking her credibility into account, the Court finds that her testimony supports Spears' conviction of aiding and abetting fraud during an attempted firearms purchase.

Spears also argues that Tirsah Payne never communicated to either Tony or himself that she was a felon, and, that because she failed to do so, he could not have aided and abetted her "in

---

[6] Tr., Vol. I, p. 112, lines 3-13; see also *Id*. at p. 162, lines 4-14.

furnishing the fake carry permit with the intent to deceive the firearms dealer as to her felony status." However, the Court finds that, for purposes of aiding and abetting, it is enough that Tirsah Payne testified she told Tony and Spears that she was "on probation," and that, legally, she "couldn't purchase a handgun."[7] Once she communicated this information to them and they proceeded to specifically encourage her to use the fake permit to buy a gun from a gun shop, they aided and abetted her attempted deception.

Finally, Spears argues that he had "no knowledge that Tirsah Payne intended to furnish her fake carry permit to a federally licenced firearms dealer as opposed to a non-federally licenced firearms dealer or other party." The Court agrees with the Government that the testimony of Tirsah Payne clearly shows that Tony and Spears encouraged her to use the fake permit to "go in a gun store and [] purchase a handgun and come out with it the same day."[8] A gun shop must be federally licensed to sell firearms; thus, by encouraging her to go to a "gun store" to attempt to purchase a gun, Spears and Tony aided and abetted her in "present[ing] the fake carry permit to a federally licensed firearms dealer."

In light of the foregoing, and after considering the testimony of Tirsah Payne and the evidence in its entirety, it is clear to

---

[7] Tr., Vol. I, p. 112, lines 3-7; see also *Id*. at p. 162, lines 4-10.

[8] Tr., Vol. I, p. 112, lines 12-13; see also *Id*. at p. 162, lines 11-14.

this Court that the verdict does not stand against the manifest weight of the evidence.

CONCLUSION

For the reasons set forth above, the Motion for a New Trial (DE #132) is **DENIED**.

**DATED: March 11, 2011**                    **/s/RUDY LOZANO, Judge**
                                            **United States District Court**